[Cite as *State v. Sanderson*, 2019-Ohio-3589.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28149 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2588 |
| | : | |
| JUSTIN SANDERSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of September, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Justin Sanderson appeals his conviction and sentence for the following offenses: three counts of rape, in violation of R.C. 2907.02(A)(2), all felonies of the first degree; seven counts of sexual battery, in violation of R.C. 2907.03(A)(6), all felonies of the third degree; two counts of gross sexual imposition (GSI) in violation of R.C. 2907.05(A)(1), both felonies of the fourth degree; two counts of kidnapping, in violation of R.C. 2905.01(A)(4), both felonies of the first degree; one count of aggravated burglary, in violation of R.C. 2911.11(A)(2), a felony of the first degree; and four counts of interfering with civil rights, in violation of R.C. 2921.45(A), all misdemeanors of the first degree. Each count of kidnapping was accompanied by a sexual motivation specification pursuant to R.C. 2941.147. Sanderson filed a timely notice of appeal with this Court on October 2, 2018.

{¶ 2} The record establishes that in the late spring of 2015, Sanderson began working as a security officer at a company called G4S. Mark Wysong testified that he was the owner of G4S and that he hired Sanderson. Wysong testified that he was also the Chief of the Phillipsburg Police Department (hereinafter "PPD"). In November 2015, Wysong hired Sanderson as a part-time police officer at the PPD. The offenses for which Sanderson was arrested and later convicted occurred during a six-week period in 2017 while he was employed as a police officer in Phillipsburg.

**Events of May 19-20, 2017**

{¶ 3} The record establishes that late on the night of May 19, 2017, K.W., 22 years old, was driving back to her residence in Greenville, Ohio, after a night spent with friends in the Oregon District in downtown Dayton, Ohio. Sometime after midnight on May 20, 2017, Sanderson initiated a traffic stop of K.W. as she traveled on State Route 49. K.W.

testified that she was very anxious upon being pulled over as she had been drinking alcohol and did not have a driver's license. After K.W. informed Sanderson that she did not have a driver's license, he removed her from the vehicle, handcuffed her with her hands behind her back, and placed her in the rear of his cruiser.

{¶ 4} Sanderson drove K.W. to the Phillipsburg Municipal Building, where the police station is also located. K.W. testified that there was no one else present at the police station and most of the lights had been turned off when they arrived. K.W. testified that Sanderson had her perform a single field sobriety test, the "walk and turn." K.W. remained handcuffed while she performed the test. Sanderson informed K.W. that she failed the test and asked her what he "should do about what was going on." Tr. 444. K.W. testified that at this point she was crying and very frightened because she thought she was going to jail. K.W. testified that she was also confused because Sanderson was asking her how he should handle the situation.

{¶ 5} Sanderson asked K.W. if he could pat her down. K.W. testified that Sanderson stood behind her and started to pat her down. K.W. testified that Sanderson then pulled up her dress, pulled down her shorts and underwear, and started kissing her buttock. Thereafter, Sanderson directed a still-handcuffed K.W. to sit on the edge of a desk. Once K.W. sat down, Sanderson began performing oral sex on her. K.W. testified that Sanderson then bent her over the desk and inserted his penis into her vagina from behind. K.W. testified that Sanderson removed his clothes and took off her dress. Sanderson then carried her into another room in the station and continued having vaginal intercourse with her on the floor.

{¶ 6} The sexual assault ended a short time later, and Sanderson and K.W. got

dressed. K.W. testified that Sanderson then transported her back to where she left her vehicle. Sanderson also told K.W. to follow him back to her residence in Greenville so that she would not get pulled over by any other police officers patrolling the area. While she was driving from Phillipsburg to her home in Greenville, K.W. called her mother, T.M., on her cellphone. K.W. informed T.M. that she had been pulled over in Phillipsburg on the way to the residence they shared and had been raped by a police officer. K.W. also informed T.M. that the officer who had raped her was following her home. T.M. testified that during their conversation, K.W. sounded very upset and was crying.

{¶ 7} When they arrived at K.W.'s residence, Sanderson stopped his cruiser at the end of her driveway and asked her for her phone number. K.W. testified that she felt compelled to give Sanderson her phone number because she was in shock from being assaulted and because she was scared that Sanderson might attempt to arrest her for driving while intoxicated and driving without a driver's license. After K.W. got home, T.M. looked out the window and observed a police cruiser parked at the end of the driveway.

### Events of June 2-3, 2017

{¶ 8} On the evening of June 2, 2017, T.B. attended a pool party at a friend's residence in Huber Heights, Ohio. T.B. left the party at approximately 11:30 p.m. T.B. testified that she observed a Phillipsburg police cruiser parked on the side of State Route 49 shortly after midnight near her residence. T.B. testified that she arrived at her residence and had been inside approximately ten minutes when she heard a knock on her front door. When she answered the door, she observed Sanderson, whom she recognized as a Phillipsburg police officer. Sanderson asked T.B. for her name. T.B. testified that Sanderson then asked her if she was aware that her husband had an

outstanding warrant for his arrest. T.B. informed Sanderson that she was aware of the warrant for her husband for unpaid fines levied by Vandalia Municipal Court, but that he was currently at work.

{¶ 9} T.B. testified that at this point, Sanderson informed her that she also had an outstanding warrant for her arrest.[1] T.B. testified that she told Sanderson that she was unaware of any warrant and asked him to produce documentation confirming that a warrant existed. Sanderson replied, "We'll get to that." Tr. 554. Sanderson then told T.B. to pull out her bra, and he proceeded to pat her down under her shirt. T.B. testified that Sanderson also pulled on her belt loop and asked her if she was wearing any underwear. At this point, Sanderson placed T.B. in handcuffs behind her back and led her out to his police cruiser. Before leaving, T.B. asked Sanderson if she could retrieve her cellphone, but he told her not to worry because they would be returning to her residence at a later time. Sanderson then placed T.B. in the back of his cruiser and drove to the police station.

{¶ 10} Upon arriving at the station, T.B. again asked Sanderson to produce documentation regarding the alleged warrant. Sanderson stated that he would try to locate the warrant, and he left T.B. sitting in a room for a short time. T.B. testified that when Sanderson came back, he removed her handcuffs and began patting her down again. T.B. testified that she believed it was a great deal more intrusive than was necessary. T.B. testified that Sanderson pulled on her bra and began touching her breasts. T.B. testified that she tried to pull away, and Sanderson stopped and sat down

---

[1] The record establishes that T.B. did in fact have an outstanding warrant through Eaton Municipal Court.

in a chair facing her. T.B. testified that at this point, she was crying and praying out loud. Sanderson told T.B. to calm down and stated "jails not that bad, it's not that scary." Tr. 571. Sanderson then left the room again.

{¶ 11} When Sanderson returned, he handcuffed T.B. again. T.B. testified that she was very scared at this point and told Sanderson "just take me to jail." Tr. 573. Sanderson asked T.B., "What do you suggest?" *Id.* T.B. testified that she asked, "Suggest for what?" Sanderson replied, "To make this go away." *Id.* Sanderson also told T.B. "you may not realize how hot you are." Tr. 576. Sanderson then ordered T.B. to stand up and turn around. Sanderson stood behind her and began running his hands down her and around to the front of her body. T.B. testified that he grabbed her breasts, unbuttoned the top of her shorts, and stuck his hand down her pants. T.B. testified that Sanderson then digitally penetrated her vagina, and she pulled away, stating "she was not that kind of girl" and to "just take her to jail." Tr. 578.

{¶ 12} At this point, Sanderson placed T.B. back in his cruiser and drove her back to her residence. Before letting her out of the cruiser, Sanderson told T.B. to resolve the outstanding warrant. Sanderson also told her that he would check on the status of the warrant the next time he was on duty, and if had not been resolved, he would come back. T.B. exited the cruiser and ran into her residence. Once inside, she locked the door and called her husband to inform him of what had happened.

{¶ 13} T.B. testified that Sanderson came to her residence the following week on Friday, June 9, 2017, at approximately 11:30 p.m. T.B. testified that she was at home with her daughter at the time. Sanderson informed T.B. that he was aware that she had resolved her warrant. T.B. testified that she told Sanderson to never return to her

residence for any reason, and that she would call the Clay Township Police or the Montgomery County Sheriff if he did.

**Events of June 27-28, 2017**

{¶ 14} K.T. and T.U. were prostitutes who advertised their services as a duo on an internet site called Backpage.com. T.U. created the advertisement. On June 27, 2017, a male identifying himself as "Slick Johnson" responded to T.U.'s advertisement and sent a photograph of himself as well. The man in the photograph was identified by K.T. and T.U. as Sanderson. In his response to the advertisement, Sanderson offered the two women $160 for their services and agreed to meet them at the Knights Inn hotel in Vandalia, Ohio, in Room 165.

{¶ 15} While he was in uniform and on patrol duty that night, Sanderson traveled in his cruiser from Phillipsburg to the Knights Inn in Vandalia. Upon arriving at the hotel, Sanderson went to the front desk and placed a pair of handcuffs on the counter in front of the clerk, H.P. H.P. testified that Sanderson asked for the key to Room 165. Sanderson informed H.P. that he was conducting a "prostitution investigation." H.P. testified that he did not want to disobey an order from a uniformed police officer, so he gave Sanderson the hotel's master key.

{¶ 16} Sanderson went to Room 165 and knocked on the door. K.T. testified that she looked through the peephole and observed a uniformed police officer. K.T. did not open the door. Rather, K.T. informed T.U. that there was police officer at the door and to therefore be quiet. When the women refused to answer the door, Sanderson used the master key to gain entrance to the hotel room. K.T. testified that Sanderson walked into the room and immediately looked in the bathroom, asking the women where their pimp

was. K.T. testified that she informed Sanderson that they did not have a pimp, but were in business for themselves. Sanderson then asked the women for identification. K.T. testified that she recognized Sanderson from the photograph that he sent earlier that day. Sanderson took the women's identification, radioed in to dispatch, and wrote some information down in "little black book" that he kept in his pocket. Tr. 182. K.T. testified that Sanderson was in full police uniform and was armed with a handgun and a Taser.

{¶ 17} At this point, Sanderson ordered the women to lift up their dresses so that he could search them. K.T. testified that he made them show their bras and bare skin. T.U. testified that Sanderson ran his finger along the inside of the waistband of her see-through underwear. Sanderson then asked the women if there were any drugs in the room. K.T. testified that she responded by taking a small baggie of marijuana out of a Swisher Sweets box located on the nightstand and throwing it on the middle of the bed. K.T. testified that she had been arrested for prostitution in the past, and she thought that Sanderson was behaving strangely for a police officer under the circumstances.

{¶ 18} K.T. testified that Sanderson then placed her in handcuffs with her hands in front of her body, and he used foot shackles to handcuff T.U., also with her hands in front of her body. T.U. testified that Sanderson handcuffed them because K.T. was "talking too much and making him nervous." Tr. 258. Sanderson eventually removed the handcuffs from the women. K.T. testified that Sanderson told them that he would not arrest them if they promised to take down the advertisement on Backpage.com, and if they "show[ed] him their boobs." Tr. 262. T.U. testified that they complied by taking down the Backpage.com advertisements in his presence and by both women revealing their breasts to him.

**{¶ 19}** Thereafter, Sanderson left the room and returned the master key to the front desk. K.T. testified that Sanderson returned approximately five minutes later and knocked on the door. K.T. opened the door and allowed Sanderson into the room. Once inside, Sanderson asked the women if they "wanted to have fun off the record." Tr. 265. Both K.T. and T.U. were still afraid that Sanderson was going to arrest them, so they responded affirmatively. K.T. also testified that she had been violently raped in the past. Therefore, K.T. testified that she did not want to have to fight Sanderson off or get raped at gunpoint if she refused his advances. K.T. testified that Sanderson took off his pants and sat down on the bed, at which point K.T. and T.U. took turns performing fellatio on him. Sanderson then told K.T. and T.U. to get on their hands and knees after which he penetrated both women vaginally from behind with his penis.

**{¶ 20}** K.T. testified that Sanderson stopped the assault shortly thereafter, stating that he had to get back to work before his boss discovered his absence. Sanderson got dressed and left the room. T.U. testified that after Sanderson was gone, she and K.T. were both shocked but agreed that they would investigate whether Sanderson was actually a police officer. As previously stated, K.T. testified that she had been arrested for prostitution multiple times in the past and was familiar with detectives from the Dayton Police Department's vice squad. Therefore, K.T. contacted Detective John Howard and informed him of the events surrounding Sanderson's sexual assault of her and T.U. K.T. also gave Detective Howard the photograph of "Slick Johnson" that she had been sent. Using this information, Detective Howard was able to identify Sanderson as a suspect. Detective Howard shared this information with the FBI and Vandalia Police Sergeant Thomas Vallery.

**{¶ 21}** On July 6, 2017, Vandalia Police Officer Cody Anderson was on patrol when he observed a Phillipsburg Police cruiser in the parking lot of the Knights Inn. Having been briefed on the investigation into Sanderson, he immediately contacted his superiors regarding the presence of the Phillipsburg cruiser. Shortly thereafter, Sergeants Flynn and Vallery arrived at the Knights Inn, where they arrested Sanderson and took him into custody. Upon being questioned regarding his presence at the hotel in another jurisdiction, Sanderson stated that he was conducting a human trafficking investigation. Significantly, Phillipsburg Police Chief Wysong testified that Sanderson had never been cleared to conduct a human trafficking investigation in Vandalia or anywhere else.

**{¶ 22}** When he was initially arrested on July 6, 2017, the police were still unaware of Sanderson's sexual assaults of K.W. and T.B. The record establishes that K.W. told a friend about the assault, and after hearing about Sanderson's arrest on the news, the friend contacted Vandalia police. T.B.'s husband contacted a friend employed by the Clay Township Police Department, Officer Martin Stringfellow, for advice on how to report a rape committed by a police officer. When Officer Stringfellow heard about Sanderson's arrest on the news, he contacted the Vandalia police.

**{¶ 23}** Thereafter, on August 28, 2017, Sanderson was indicted for three counts of rape (by force or threat of force), seven counts of sexual battery (other person in custody), two counts of gross sexual imposition (by force or threat of force), two counts of kidnapping (sexual motivation), one count of aggravated burglary (deadly weapon), two counts of unauthorized use of a law enforcement gateway, and four counts of interfering with civil rights. As previously stated, both kidnapping counts were accompanied by sexual motivation specifications. At his arraignment on August 31, 2017, Sanderson

pled not guilty to the charged offenses.

{¶ 24} On October 3, 2017, Sanderson filed a motion to suppress any statements he made to police after being arrested and taken into custody. On December 19, 2017, Sanderson filed a motion to withdraw his motion to suppress. On April 6, 2018, Sanderson filed a waiver of his right to a jury trial.

{¶ 25} On August 20, 2018, the State dismissed the two counts of unauthorized use of a law enforcement gateway (Counts XIV and XV). Sanderson's bench trial began on August 20 and ended on August 22, 2018. On August 29, 2018, the trial court filed an entry finding Sanderson guilty of all of the remaining counts in the indictment. The trial court also ordered a presentence investigation report (PSI).

{¶ 26} On September 12, 2018, the trial court sentenced Sanderson as follows:

**K.W.**

Count I – GSI – 18 months

Count II – Rape – 11 years mandatory

Count III- Sexual Battery – merged with Count II

Count IV – Rape – 11 years mandatory

Count V – Sexual Battery – merged with Count IV

Count VI – Kidnapping – 11 years

Count VII – Interference with Civil Rights. – 180 days

**T.B.**

Count VIII – Rape – 11 years mandatory

Count IX – Sexual Battery – merged with Count VIII

Count X – GSI – 18 months

Count XI – Kidnapping – 11 years

Count XII - Interference with Civil Rights – 180 days

**K.T. and T.U.**

Count XIII – Aggravated Burglary – K.T. and T.U. – 10 years

Count XVI - Interference with Civil Rights – K.T. – 180 days

Count XVII - Interference with Civil Rights – T.U. – 180 days

Count XVIII – Sexual Battery – K.T. – 60 months

Count XIX – Sexual Battery – K.T. – 60 months

Count XX - Sexual Battery – T.U. – 60 months

Count XXI - Sexual Battery – T.U. – 60 months

**{¶ 27}** The trial court ordered the three rape convictions and two of the sexual battery convictions to be served consecutively, and the other sentences to be served concurrently, for an aggregate sentence of 43 years in prison. The trial court also designated Sanderson as a Tier I (GSI), Tier II (Kidnapping), and Tier III (Rape) sex offender.

**{¶ 28}** It is from this judgment that Sanderson now appeals.

**{¶ 29}** Sanderson's first assignment of error is as follows:

SANDERSON'S CONVICTIONS ARE NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 30}** In his first assignment of error, Sanderson contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 31} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 32} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69. A claim that a verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Citations omitted.) *Id.* at ¶ 71.

{¶ 33} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v.*

*Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 34} This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

## Aggravated Burglary (Deadly Weapon)

{¶ 35} Sanderson was convicted of aggravated burglary (deadly weapon) (Count XIII). With respect to this count, the indictment charged that Sanderson:

[B]y force, stealth or deception, did trespass in an occupied structure, to-wit: HOTEL ROOM located at 7563 POE AVENUE, DAYTON, OHIO 45414 * * * when another person, other than an accomplice of the offender, was present, with purpose to commit in the structure * * *, any criminal offense, and did have a deadly weapon or dangerous ordnance, on or about his person or under his control; contrary to the form of the statute (in violation of Section 2911.11(A)(2) of the Ohio Revised Code) * * *.

Doc. #1, p. 5-6.

{¶ 36} R.C. 2911.11(A)(2) provides that:

No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:

* * *

(2) The offender has a deadly weapon or dangerous ordnance on or about

the offender's person or under the offender's control.

{¶ 37} In its entry finding him guilty of aggravated burglary, the trial court found beyond a reasonable doubt that Sanderson, while armed with his service weapon, trespassed by force, stealth, or deception into an occupied structure, the hotel room where K.T. and T.U. were present, and that he did so with purpose to commit a criminal offense. On appeal, Sanderson argues that he did not need permission to enter the hotel room because he was conducting a "human trafficking investigation" and therefore on official police business. Sanderson also argues that he knew that K.T. and T.U. were engaged in illegal activity inside the hotel room.

{¶ 38} As previously stated, H.P., the motel clerk, testified that he only handed over the master key to Sanderson because he was scared to disobey the order of a police officer. Additionally, when Sanderson initially approached the front desk, he laid his handcuffs down on the counter in front of H.P. ostensibly to intimidate the clerk into giving him a key to the room in which K.T. and T.U. were located. Sanderson also told H.P. that he was conducting a "prostitution investigation." It is undisputed that Sanderson then used the master key to gain entrance to Room 165 without the consent of K.T. or T.U.

{¶ 39} Upon review, we conclude that that viewed in a light most favorable to the State, a reasonable factfinder could find from the evidence adduced at trial that Sanderson's "human trafficking investigation" was an illegal and deceptive means to gain entry into K.T. and T.U.'s hotel room. Phillipsburg Police Chief Wysong testified that he was unaware of Sanderson's purported "human trafficking investigation" and did not give Sanderson permission to conduct any such investigation. Chief Wysong testified that

Sanderson did not have permission to travel to another jurisdiction to conduct any type of investigation. Additionally, the record establishes that Sanderson failed to inform anyone at the Phillipsburg Police Department that he was leaving his jurisdiction to travel approximately 20 minutes to Vandalia. Sanderson's daily log for June 27-28, 2017, contains no mention of his purported "human trafficking investigation." Significantly, the evidence adduced at trial established that Sanderson falsified his daily log and misrepresented his location to the Regional Dispatch Center while he was in Vandalia at the hotel.

{¶ 40} In *State v. Ramey*, 2d Dist. Montgomery No. 27636, 2018-Ohio-3072, we stated the following:

"Trespass" is defined by R.C. 2911.21(A), which states that "[n]o person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). " 'Force' is satisfied by 'any effort physically exerted.' " *State v. Johnson*, 2d Dist. Montgomery No. 26961, 2017-Ohio-5498, ¶ 21, quoting *State v. Snyder*, 192 Ohio App.3d 55, 2011-Ohio-175, 947 N.E.2d 1281, ¶ 18 (9th Dist.). This court has held that "the effort necessary to open a door, locked or unlocked, is sufficient to satisfy the element of 'force' necessary to prove burglary." *State v. DeMoss*, 2d Dist. Champaign No. 2001-CA-5, 2002 WL 360581, *10 (Mar. 8, 2002), quoting *State v. Ford*, 2d Dist. Montgomery No. 15374, 1996 WL 257442, *2 (May 17, 1996).

*Id.* at 45.

**{¶ 41}** Both K.T. and T.U. testified that Sanderson did not have permission to enter their hotel room. Furthermore, the "force" element of aggravated burglary was satisfied when Sanderson opened the door to the hotel room and came inside. Finally, Sanderson was armed with his service weapon clearly visible in a holster on his police belt. It was irrelevant that he did not use or brandish the weapon in the presence of the women. The evidence further established that Sanderson's assertion that he was conducting a "human trafficking investigation" was merely a deception on his part to gain entry into the room for illicit purposes. Accordingly, the State adduced sufficient evidence that Sanderson entered the women's hotel room with the purpose to commit a criminal offense, which he ultimately did. We conclude that there was sufficient evidence in the record to support Sanderson's conviction for aggravated burglary. We further conclude that this is not an exceptional case requiring a reversal as being against the manifest weight of the evidence.

### Sexual Battery Against K.T. and T.U.

**{¶ 42}** Here, Sanderson argues that the evidence adduced at trial was insufficient to support his convictions for sexual battery against K.T. and T.U., as proscribed by R.C. 2907.03(A)(6), which provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person." Specifically, Sanderson argues that the State failed to establish that K.T. and/or T.U. were "in custody of law" or that he had "supervisory or disciplinary authority over" them.

{¶ 43} Neither the "in custody of law" nor the "supervisory or disciplinary authority" phrase in R.C. 2907.03(A)(6) has a legislative definition or a technical or particular meaning. Therefore, these phrases must be read in context and construed according to common usage. *State v. Manocchio*, 138 Ohio St.3d 292, 2014-Ohio-785, 6 N.E.3d 47, ¶ 17, citing R.C. 1.42.; *see also State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 16 (10th Dist.) ("Because 'supervisory or disciplinary authority' is not statutorily defined, the words must be construed according to the rules of grammar and common usage").

{¶ 44} "Custody" means "[t]he care and control of a thing or person for inspection, preservation, or security" and "law" means "[t]he judicial and administrative process; legal action and proceedings." *Black's Law Dictionary* 412 and 900 (8th Ed.2004). Sanderson asserts that R.C. 2907.03(A)(6) in general and this phrase in particular has traditionally been found to refer to prisoners and patients in a hospital or other institution. This interpretation is based upon language expressed in the 1973 Legislative Service Commission Comment, which states that this subsection "proscribes sexual conduct with a prisoner, or with a patient in a hospital or institution, by an offender who has supervisory or disciplinary authority over the victim."

{¶ 45} However the First District Court of Appeals has stated that this phrase is "obviously elastic and does not necessarily require actual imprisonment or physical detention," although it arguably "does require some showing that the victim's liberty was restrained by some power conferred by the state." *State v. Walker*, 140 Ohio App.3d 445, 455, 748 N.E.2d 79 (1st Dist.2000). That is, the plain meaning of "in custody of law or a patient in a hospital or other institution" is not restricted to prisoners and patients; it includes "prisoners, patients, and residents" and "does not require proof of coercion,

impairment, or other condition." *See generally* Katz, Martin, Lipton, Giannelli, and Crocker, *Baldwin's Oh. Prac. Crim L.*, Section 99:10 (3d Ed.2014); *State v. Roy*, 2014-Ohio-5186, 22 N.E.3d 1112, ¶ 43 (9th Dist.) (several districts have interpreted R.C. 2907.03(A)(6) to be "applicable to custodial-type settings"). *See State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 24 (child who had been adjudicated delinquent was placed in a children's home pursuant to court order, thereby restraining his liberty; accordingly, the jury had sufficient evidence before it to determine that the child was "in custody of law" when the defendant engaged in sexual conduct with him).

{¶ 46} In the instant case, Sanderson argues that K.T. and T.U. were not "in custody of law" at the time that the sexual conduct actually occurred because he had left and then returned to the room, where he was voluntarily granted entry by K.T. However, this argument ignores the fact that Sanderson initially entered the women's room without permission to do so, searched the room for contraband, obtained their personal information, ran the information through dispatch, handcuffed both women, and patted them down. When he returned to the room after returning the master key, both K.T. and T.U. testified that they were still afraid that Sanderson was going to arrest them, so they responded affirmatively when he asked them if they "wanted to have fun off the record." Tr. 265. Both women testified that they did not feel free to leave. K.T. also testified that she had been violently raped in the past. Therefore, K.T. testified that she did not want to have to fight Sanderson off or get raped at gunpoint if she refused his advances. We also note that during the entirety of the assault, Sanderson was wearing his police uniform, had handcuffs, and was armed with his service weapon and Taser. Accordingly, the trial court did not err when it held that the State had adduced sufficient

evidence that K.T. and T.U. were in "custody of law" and under Sanderson's "supervisory or disciplinary authority" when they felt that they had to acquiesce to his sexual demands.

{¶ 47} Therefore, after viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of sexual battery, in violation of R.C. 2907.03(A)(6), proven beyond a reasonable doubt. We further conclude that this is not an exceptional case requiring a reversal as being against the manifest weight of the evidence.

### Kidnapping (Sexual Activity) Against K.W. and T.B.

{¶ 48} Sanderson was convicted of two counts of kidnapping (sexual motivation) in violation of R.C. 2905.01(A)(4), which states in pertinent part:

No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

{¶ 49} In this section, Sanderson contends that the State failed to adduce sufficient evidence that he removed or restrained either K.W. or T.B. for the purpose of sexual activity. Sanderson acknowledges that he removed both women from the places they were initially found by him and took them to the Phillipsburg Police Station. Sanderson also acknowledges that he restrained both women at the station by handcuffing and holding them there for a brief time. Sanderson defends his actions in this regard by arguing that he was authorized under the law to detain and/or arrest both women because they had broken the law. In K.W.'s case, Sanderson asserts that she was driving while

intoxicated and she did not have a driver's license. In T.B.'s case, Sanderson argues that she had an outstanding warrant for her arrest. Thus, Sanderson argues that he had valid legal basis to take both women into custody and bring them to the police station. We also note that Sanderson denies engaging in any sexual activity with T.B.

{¶ 50} However, Sanderson's arguments are undermined by the fact that he did not ultimately arrest either K.W. or T.B. In fact, even though he was allegedly concerned about her level of intoxication and her lack of a driver's license, Sanderson permitted K.W. to drive back to her residence in Greenville after he raped her twice, even following her home in order to keep any other police officers from stopping her. With respect to T.B., Sanderson handcuffed her and transported her to the police station allegedly because she had an outstanding warrant. Once at the station, Sanderson proceeded to fondle her breast and digitally penetrate her vagina as he "patted her down." Inexplicably, once the assault ended, he immediately drove her back to her residence, warning her that he would return if she did not resolve the warrant.

{¶ 51} Upon review, we conclude that sufficient evidence was adduced to establish that Sanderson removed and restrained K.W. and T.B. to the police station under the guise of upholding the law in order to sexually assault both women. Accordingly, after viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of kidnapping (sexual motivation), in violation of R.C. 2905.01(A)(4), proven beyond a reasonable doubt. We further conclude that this is not an exceptional case requiring a reversal as being against the manifest weight of the evidence.

**Interference with Civil Rights (K.W., T.B., K.T., & T.U.)**

{¶ 52} Sanderson was convicted of four counts of interfering with civil rights, in violation of R.C. 2921.45(A), which states in pertinent part:

No public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right.

{¶ 53} "The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Investigatory detention, often referred to as a *Terry* stop, allows an officer to briefly stop and temporarily detain individuals in order to investigate possible criminal activity. *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304 (2d Dist.), citing *Terry*. An investigatory stop does not constitute an arrest or place the suspect in custody. *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 16 (10th Dist.). It is well established that "[a]n individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *State v. Love*, 2d Dist. Montgomery No. 23902, 2011-Ohio-1287, ¶ 18, quoting *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 13-16 (2d Dist.).

{¶ 54} To justify a pat-down under Terry, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* at 21. Once a lawful stop has been made, a police officer may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to

others. *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993); *State v. Molette*, 2d Dist. Montgomery No. 19694, 2003-Ohio-5965, ¶ 13. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans* at 408, quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

{¶ 55} Initially, we note that Sanderson was convicted of interfering with the civil rights of K.W., T.B., K.T., and T.U. by depriving them of their Fourth Amendment rights to be free from unreasonable searches and seizures. Arguably, Sanderson could have potentially justified conducting a brief pat-down search of K.W. and T.B. before he placed them in his cruiser to take them to the police station if he reasonably believed that either woman might have been armed or a danger to him or to others. Conversely, both K.T. and T.U. were in a relative state of undress when Sanderson encountered them. Therefore, it would be more difficult to articulate a reasonable and articulable suspicion to support a pat-down of K.T. and T.U. Moreover, as we have previously stated, Sanderson had no right to be in their hotel room in the first place as he was committing aggravated burglary when he entered the room without the women's consent.

{¶ 56} Nevertheless, the manner in which Sanderson conducted the pat-downs was unlawful, and his actions in this regard were clearly unjustifiable and unlawful. Specifically, after bringing a handcuffed K.W. into an empty police station, Sanderson proceeded to pat-down K.W. by pulling up her dress, pulling down her shorts and underwear, and kissing her buttock. Thereafter, Sanderson directed a still-handcuffed K.W. to sit on the edge of a desk. Once K.W. sat down, Sanderson began performing oral and vaginal sex on her.

{¶ 57} With respect to T.B., Sanderson initially patted her down at her house by directing T.B. to pull out her bra and proceeding to pat her down under her shirt. T.B. testified that Sanderson also pulled on her belt loop and asked her if she was wearing any underwear. At this point, Sanderson placed T.B. in handcuffs behind her back and led her out to his police cruiser. Once they were at the police station, Sanderson removed her handcuffs and began patting her down again. T.B. testified that she believed it was a great deal more intrusive than was necessary. T.B. testified that Sanderson pulled on her bra, began touching her breasts, and digitally penetrated her.

{¶ 58} Regarding the pat-downs of K.T. and T.U., Sanderson ordered the women to lift up their dresses so that he could search them. K.T. testified that he made them show their bras and bare skin. T.U. testified that Sanderson ran his finger along the inside of the waistband of her see-through underwear.

{¶ 59} Clearly, the "pat-downs" conducted by Sanderson of the four complaining witnesses were not for legitimate law enforcement purposes, but rather to take advantage of his position as a police officer in order to sexually assault and victimize the women. In doing so, Sanderson violated the women's Fourth Amendment right to be free from unreasonable searches and seizures. Accordingly, after viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of interfering with civil rights, in violation of R.C. 2921.45(A), proven beyond a reasonable doubt. We further conclude that this is not an exceptional case requiring a reversal as being against the manifest weight of the evidence.

### Manifest weight of the Evidence (Rapes and GSI's of K.W. and T.B.)

{¶ 60} Furthermore, having reviewed the record, we find no merit in Sanderson's

manifest weight challenge regarding the sex offenses committed against K.W. and T.B. It is well settled that evaluating witness credibility is primarily for the trier of fact. *State v. Brown*, 2d Dist. Montgomery No. 27571, 2018-Ohio-3294; *see also State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. A trier of fact does not lose its way and create a manifest miscarriage of justice if its resolution of conflicting testimony is reasonable. *Id.* Here, the trial court reasonably credited the State's evidence, which established that Sanderson was guilty of the rapes and GSIs for which he was convicted in relation to K.W. and T.B.

{¶ 61} As previously stated, K.W. testified that Sanderson asked her if he could pat her down. K.W. testified that Sanderson stood behind her and started to pat her down. K.W. testified that Sanderson then pulled up her dress, pulled down her shorts and underwear, and started kissing her buttock. Thereafter, Sanderson directed a still-handcuffed K.W. to sit on the edge of a desk. Once K.W. sat down, Sanderson began performing oral sex on her. K.W. testified that Sanderson then bent her over the desk and inserted his penis into her vagina from behind. K.W. testified that Sanderson removed his clothes and took off her dress. Sanderson then carried her into another room in the station and continued having vaginal intercourse with her on the floor. After the sexual assault ended, Sanderson took K.W. to her vehicle and then followed her as she drove home.

{¶ 62} T.B. testified that during her "pat-down" Sanderson pulled on her bra and began touching her breasts. T.B. testified that she tried to pull away, and Sanderson stopped and sat down in a chair facing her. T.B. testified that at this point, she was crying and praying out loud. Sanderson then stopped and left the room. When Sanderson

returned, he handcuffed T.B. again. T.B. testified that she was very scared at this point and told Sanderson "just take me to jail." Tr. 573. Sanderson asked T.B., "What do you suggest?" *Id.* T.B. testified that she asked, "Suggest for what?" Sanderson replied, "To make this go away." *Id.* Sanderson also told T.B. "you may not realize how hot you are." Tr. 576. Sanderson then ordered T.B. to stand up and turn around. Sanderson stood behind her and began running his hands down her and around to the front of her body. T.B. testified that he grabbed her breasts, unbuttoned the top of her shorts, and stuck his hand down her pants. T.B. testified that Sanderson then digitally penetrated her vagina, and she pulled away, stating "she was not that kind of girl" and to "just take her to jail." Tr. 578.

{¶ 63} In light of the foregoing, the trial court did not lose its way and create a manifest miscarriage of justice in reaching guilty verdicts for the rapes and GSI's Sanderson committed against K.W. and T.B.

{¶ 64} Sanderson's first assignment of error is overruled.

{¶ 65} Sanderson's second and final assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT SENTENCED SANDERSON SEPARATELY FOR CERTAIN OFFENSES THAT ARE ALLIED OFFENSES OF SIMILAR IMPORT.

{¶ 66} In his final assignment, Sanderson argues that the trial court erred when it failed to merge his convictions for the rapes and kidnappings of K.W. and T.B. Sanderson also contends that the trial court erred when it failed to merge his convictions for kidnapping and interfering with civil rights in relation to K.W. and T.B. We disagree.

{¶ 67} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 68} The Ohio Supreme Court clarified the applicable standard when determining whether offenses merge as allied offenses of similar import in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892:

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with

separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 30-31.

**{¶ 69}** In *State v. Wood*, 2d Dist. Montgomery No. 26134, 2016-Ohio-143, this Court stated the following:

[T]he Ohio Supreme Court addressed the allied-offense issue again in *State v. Earley*, [145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266]. There the majority characterized the analysis in its earlier [*State v.*] *Johnson*[, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061] lead opinion as "largely obsolete." *Id.* at ¶ 11. The *Earley* court instead embraced *Ruff*, which, as noted above, considers a defendant's conduct, his animus, and the import or significance of his offenses. Applying *Ruff*, the *Earley* court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. For purposes of our analysis here, we note that a defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo. *State v. LeGrant*, 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 15.

* * *

We reach the same conclusion under the *Ruff* standard, which the Ohio Supreme Court applied in *Earley*. We see nothing in *Ruff* that alters or undermines the foregoing analysis about [the defendant's] commission

of murder and aggravated robbery involving the same conduct committed with the same animus. For the reasons set forth above, we conclude that the two offenses were not committed separately and were not committed with a separate animus or motivation. These findings remain pertinent under *Ruff*, which, as noted above, provides that offenses do not merge if "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25 [and] ¶ 30-31.

*Id*. at ¶ 54, quoting *State v. McGail*, 2015-Ohio-5384, 55 N.E.3d 513, ¶ 51, 60 (2d Dist.).

**{¶ 70}** An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

**{¶ 71}** Sanderson argues that his rape and kidnapping convictions were subject to merger as allied offenses because his purpose for kidnapping K.W. and T.B. was motivated by his intent to rape them. Sanderson contends that the rapes and kidnappings constituted a continuous course of conduct and were therefore subject to merger.

**{¶ 72}** With respect to the offenses of rape and kidnapping, the Ohio Supreme Court has acknowledged that "implicit within every forcible rape * * * is a kidnapping"

because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). In *Logan*, the court provided the following guidelines for determining whether kidnapping and another offense are allied offenses that should merge prior to sentencing, stating:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

{¶ 73} Applying these guidelines, the Ohio Supreme Court held in *Logan* that the offender's conduct in forcing the victim into an alley before raping her at knife point was committed without a separate animus. The court found that the movement was slight, the detention brief, and the victim was released immediately after the commission of the underlying crime, compelling the court's conclusion that the kidnapping was incidental to the rape. *Id.* at 135.

{¶ 74} In *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, we

addressed a case in which the defendant claimed that kidnapping was incidental to the rapes he committed. In *Portman*, the defendant led the victim through the store to a lounge-type area in the basement, which could not be seen from the parking lot and was more isolated than other parts of the store. *Id.* at ¶ 42. The defendant put a gun to her head when she expressed her desire to leave, asking her about the friend waiting in her car and preventing her from leaving. *Id.* After the rapes, the defendant again attempted to prevent her from leaving the basement, through physical restraint and brandishing the gun. *Id.* We found that, although the additional aspects of time, distance, and danger that related to the kidnapping in *Portman*, as separate from the rape, were not as significant as those found in some of the other cases we discussed, we specifically noted that the defendant threatened the victim with a gun and prevented her from leaving, before and after the rapes occurred. *Id.* Ultimately, we found that the trial court did not err in failing to merge the kidnapping count with the rape counts.

{¶ 75} In *State v. Bozeman*, 2d Dist. Clark No. 2014-CA-38, 2015-Ohio-616, we found that the kidnapping and subsequent rape of the victim were committed with a separate animus, and therefore not allied offenses of similar import. *Id.* at ¶ 18. Specifically, the victim was kidnapped at gunpoint, robbed, and then transported in her own stolen vehicle to various locations. *Id.* The victim was then raped multiple times in another undisclosed location. *Id.* After the rapes occurred, the defendant robbed the victim of her wedding rings and threatened her, again at gunpoint, not to report the incident to police or he would harm her and her family. *Id.* Accordingly, we held that due to the prolonged nature of the detention of the victim prior to the rape, the additional aspect of travel to several different locations, and the danger related to the actual

kidnapping (i.e. threats made at gunpoint), the offenses were committed with a separate animus, and the trial court did not err when it failed to merge the kidnapping with the rape. *Id.*

**{¶ 76}** Upon review, we conclude that the facts of the instant case are distinguishable from the holding in *Logan*. The evidence adduced at trial established that the kidnappings and subsequent rapes of K.W. and T.B. were committed with a separate animus, and therefore the offenses were not allied offenses of similar import. While Sanderson's decision to kidnap both women was sexually motivated, the evidence adduced at trial established substantial movement and restraint of K.W. and T.B., as well as a substantial increase in the risk of harm caused by said restraint. With respect to K.W., Sanderson restrained her in handcuffs at the scene of the traffic stop, transported her to the Phillipsburg Police Station, then continued to restrain her before raping her in one room and moving her to another room and raping her again. After the assaults, Sanderson restrained K.W. in his cruiser when he drove her back to her vehicle.

**{¶ 77}** Sanderson followed a similar pattern with T.B. insofar as he handcuffed her and transported her in his cruiser to the police station. Once there, Sanderson kept T.B. handcuffed before he removed the restraints and digitally raped her. After the assault, Sanderson restrained T.B. in his cruiser when he drove her back to her house.

**{¶ 78}** Accordingly, due to the prolonged nature of the detention of the victims before and after the rapes, and Sanderson's act of transporting the women to and from a different and isolated location (the police station), we find that the offenses were committed with a separate animus, and the trial court did not err when it failed to merge the kidnappings with the rapes.

{¶ 79} Finally, Sanderson contends that his convictions for kidnapping and interfering with civil rights relating to K.W. and T.B. were subject to merger because the offenses were committed as a continuous course of conduct. However, as previously stated, Sanderson handcuffed both women, transported them to the police station, then continued the restraint before raping them. After the rapes occurred, he restrained the women in his cruiser when he drove them back to where he initially found them.

{¶ 80} Separate and apart from the kidnappings, Sanderson interfered with the women's civil rights when he performed unlawful pat-downs which violated their Fourth Amendment right to be free from unreasonable searches and seizures. Thus, we find that the kidnappings of K.W. and T.B. were committed with a separate animus and a separate identifiable harm from his convictions for interfering with civil rights. Thus, the trial court did not err when it failed to merge the offenses.

{¶ 81} Sanderson's second assignment of error is overruled.

{¶ 82} Both of Sanderson's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Ben M. Swift
Hon. Steven K. Dankof