The STATE of Ohio, Appellee,

v.

WALKER, Appellant.■

[Cite as *State v. Walker* (2000), 140 Ohio App.3d 445.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990503.

Decided Sept. 29, 2000.

448

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *William E. Breyer,* Assistant Prosecuting Attorney, for appellee.

*Derek A. Farmer* and *Kenneth L. Lawson,* for appellant.

GORMAN, Judge.

The defendant-appellant, Kevin Walker, a former Cincinnati police officer, was tried on eleven counts of bribery and sexual battery arising from incidents in which he allegedly used his authority as a police officer to extort sexual favors from four women. The counts were tried together before a jury, which acquitted him on seven of the eleven counts, but found him guilty of one count of bribery

and three counts of sexual battery involving two of the women. The sexual-battery counts included sexual-predator specifications that were tried separately to the court, which declined to adjudicate Walker a sexual predator. Walker was sentenced to a one-year term of imprisonment on each of the counts, which involved third-degree felonies, with one of the terms to run concurrently, resulting in a three-year period of incarceration.

Walker raises four assignments of error: (1) that his convictions were based upon insufficient evidence and contrary to the manifest weight of the evidence, (2) that he was denied effective assistance of counsel, (3) that the trial court erred by admitting hearsay evidence, and (4) that the trial court abused its discretion by sentencing him to three years of incarceration. For the reasons that follow, we find merit in the first assignment but only with respect to one of the counts of sexual battery, which we hold was not supported by sufficient evidence, and thus reverse the conviction on that count. In all other respects, the judgment of the trial court is affirmed.

## I. TESTIMONY

### 1. REGINA BALLARD

Regina Ballard testified that, on an evening in September 1997, she was walking down the street to the bus stop with a friend when Walker stopped her in his police cruiser. According to Ballard, Walker advised her that he had a warrant for her arrest.

Ballard testified that Walker then placed her in the police car and eventually told her that he was going to take her to jail. She stated that Walker proposed, however, that they could "work something out" as an alternative. When she asked for an explanation, Walker made clear that the "something" to which he was referring was sex.

Ballard testified that Walker then drove her to her mother's house, but, upon seeing her father on the porch, kept driving until he eventually directed the cruiser down a dirt road. She stated that the road finally arrived at a clearing with two sheds, and that she and Walker got out of the cruiser and went into one of the sheds. Ballard then described how, at Walker's behest, she performed oral sex on him. She testified that Walker then drove her back to her mother's street.

Sgt. Daniel Oliver of the Cincinnati Police Department, Personal Crimes Unit, testified that Ballard was able to pick out Walker's picture from a photographic display. He stated that the scene of the alleged incident was subsequently investigated and that Walker's MDT ("Mobile Data Transmitter") records were reviewed. He stated that, on the day of the alleged incident, Walker's MDT

record showed that at approximately 4:30 p.m., Walker entered Ballard's Social Security number and determined that she had an outstanding warrant. He stated that the MDT printout also showed that he had a female in his cruiser, and that he was "out of service" for a period after that. Sgt. Oliver testified further that Walker did not record any involvement with Ballard on the activity sheet he filled out for the day, and that there was a fifty-minute period, unaccounted for on that sheet, roughly corresponding to the time of the alleged incident.

Walker testified that, although familiar with Ballard, he could not recall any of the events she alleged. Walker did not refute, however, the records showing that he had contact with her, or the records showing that he drove her home. He testified that he often offered a person a ride out of kindness. He specifically denied ever having Ballard gratify him sexually to avoid arrest.

### 2. TRACIE HOLLIN

Tracie Hollin testified that, in December 1996, Walker placed her in custody at a local community center and put her in handcuffs in the back seat of his police car. She testified that he then drove her to the corner of Stanton and Lincoln Avenues, underneath a viaduct, at which point he parked and got in the back of the cruiser with her. She testified that he took the handcuffs off her and that she gave him oral sex, after which he paid her eight or nine dollars and let her go.

According to Hollin, there had been one earlier incident in which she had also performed oral sex on Walker for the same amount of money. She testified that on that occasion Officer Walker was in uniform, on duty, and came up to her apartment on Gilbert Avenue after seeing her on the street. She stated that she needed the money because she was on drugs. When asked if she thought that she had open warrants, Hollin replied, "Yes." Asked if Walker had ever threatened her with the warrants, she replied, "Once." She was not asked, however, to specify when and under what circumstances he threatened her.

Sgt. Oliver testified that Hollin picked Walker out of a photographic display when he interviewed her. He also stated that a review of the MDT printouts showed that Walker entered Hollin's Social Security number on November 24, 1996, although his activity sheet for that day showed no contact with her. He testified that Walker also checked her record on March 22, 1997, and again on April 16, 1997, to determine if she had any outstanding warrants.

Walker testified that he was familiar with Hollin as a prostitute and crack addict in the Walnut Hills area. He denied that he had ever been inside Hollin's apartment or that he had ever engaged in any form of sex with her.

### 3. TASHA ALEXANDER

Tasha Alexander testified that in the summer of 1997, she was in an apartment where there were a number of people taking drugs and drinking when there came a knock on the door. She testified that when she opened the door, Walker was there, by himself, and that, instead of responding to the drug activity throughout the apartment, he pulled her out of the residence by snatching her arm. She stated that the two of them started to "tussle" in the outer hallway and that Walker pulled her to the ground, sitting on her stomach as he tried to handcuff her. During the scuffle, she said, Walker touched and rubbed her breasts "nothing like a police officer should."

Alexander testified that, as Walker was pushing her, handcuffed, into a police cruiser, he grabbed her breasts again and slid his hand under the fabric of her sports bra, touching the flesh. She then described how Walker drove her around the block and told her that she would not go to jail if she agreed to have sex with him. She testified that she refused and that he took her downtown to the Hamilton County Justice Center, but not before grabbing her breasts one more time.

Sgt. Oliver testified that, "unless under extreme circumstances," male police officers were taught never to search females but, rather, to call a female officer. If this was not possible, he testified, male officers were instructed to "use the back of your hand to go up and down the side of [the suspect] to make sure she didn't have a weapon." He stated that such a search would never include grabbing or touching a woman's breast, or going underneath her clothing.

Sgt. Oliver also testified that Alexander had identified Walker's picture out of a photographic lineup. He stated that Walker's MDT printout on the day in question showed that he "self-initiated" a patrol to the address where Alexander was present at 9:12 p.m. The printout also showed that at 9:24 p.m., Walker entered Alexander's Social Security number and verified that she had open warrants for her arrest.

Walker testified that he was familiar with Alexander from a previous incident in which she had fled from a stolen vehicle. He stated that he tracked her down to an apartment building and that he knocked on the door, found her inside with a group of people, and asked her to come out into the hallway. He stated that she denied being Tasha Alexander and kept trying "to go in her pockets." He stated that she persisted even after he ordered her to stop, and that he then attempted to pull her arm out of her pocket, creating a struggle. He contended that, after subduing her, he then patted her down and found a box cutter—a razor blade with a protective handle—as well as identification. He denied ever grabbing or fondling her breasts, or slipping his hand underneath her clothes.

4. BARBARA FANT

Fant testified that in September 1996, she was walking down the street "trying to solicit" when Walker pulled his police cruiser over to the curb. She stated that she volunteered to him that she had an outstanding warrant, and that he then entered her name in the MDT. She stated that Walker eventually told her that if she "cooperated" with him, he would only cite her to court. She added that she then got in the back seat and explained to him that she was naked underneath her jacket. According to Fant, Walker then asked her to unzip her jacket and lean forward to press her breasts against the wire partition. When she did, she testified, Walker began playing with the protruding nipple of one breast.

Fant stated that she assumed that, by allowing Walker to touch her in this manner, she was "cooperating" with him to avoid arrest. She stated, "I had cooperated with him. I said—I don't know, maybe if I don't cooperate he might plant some drugs or something on me. And I figured that ain't nobody going to believe, you know, a streetwalker, drug addict." She testified that she was frightened. When she leaned back, she added, Walker began writing out a citation, which he gave to her only after she leaned forward and allowed him to touch her nipple again.

Walker testified that on the night in question he witnessed Fant soliciting and approached her, eventually checking her identification through the MDT. He testified that he was confirming a warrant when Fant, who was in the back seat of the cruiser, soiled her pants, claiming that he had "scared the S–H–I–T" out of her. He stated that he then hurriedly wrote a ticket and "got her out of my car." He emphatically denied the allegation that he fondled her breasts through the wire partition of the cruiser.

## II. THE JURY'S VERDICT

The jury found Walker guilty of bribery and sexual battery with respect to the incident with Regina Ballard. The jury found Walker *not* guilty of bribery but guilty of sexual battery on the charges concerning Tracie Hollin and the incident in her Gilbert Avenue apartment. The jury found Walker *not* guilty of bribery but guilty of sexual battery on the charges concerning Tracie Hollin and the incident under the viaduct at Stanton and Lincoln Avenues. The jury acquitted Walker on all the charges concerning Tasha Alexander and Barbara Fant.

## III. SUFFICIENCY AND WEIGHT

In his first assignment of error, Walker challenges his convictions as based upon insufficient evidence and contrary to the manifest weight of the evidence. The state remonstrates, on the other hand, that the convictions turned entirely upon the credibility of the witnesses, and that credibility was foremost a matter to be determined by the jury. We agree with the state, with one exception.

■ As the Ohio Supreme Court has observed:

"With respect to the sufficiency of the evidence, ' "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.

Underscoring this point, Justice Cook in her separate concurrence in *Thompkins* observed that "[o]n review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Id.* at 390, 678 N.E.2d at 549 (Cook, J., concurring).

■ Conversely, when an appellate court reviews a judgment of the trial court to determine if it is contrary to the weight of the evidence, the appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of conflicting testimony. *Id.* at 387, 678 N.E.2d at 546–547. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721. The discretionary power of an appellate court to grant a new trial, however, is to be used only "in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

In order to consider the weight and sufficiency of the evidence in this case, the elements of the crimes must be considered. Bribery is committed when a public servant knowingly solicits or accepts "any valuable thing or valuable benefit" to corrupt or improperly influence him or her with respect to his or her duty. R.C. 2921.02(B).

■ Sexual battery under R.C. 2907.03(A)(6) is committed when a person engages in sexual conduct with another, not the spouse of the offender, when the other person is in legal custody and the offender "has supervisory or disciplinary authority over such other person." Significantly, the statute makes criminal even voluntary sexual activity between adults when one of those adults is in custody and the other has supervisory or disciplinary authority. As noted by one court,

"The purpose of the statute is to protect from sexual abuse those who come under the care and custody of the state. The statute is directed at those situations where the offender, through power conferred by the state, is able to coerce or force sexual activity by the misuse of that authority." *State v. Chipps* (May 17, 1983), Union App. Nos. 14–82–1 and 14–82–2, unreported, 1983 WL 7261. As statutorily defined, "sexual conduct" means vaginal and anal intercourse, as well as fellatio. R.C. 2907.01(A).

■ We hold that there was sufficient evidence, based on the victim's own testimony, to support convictions for both bribery and sexual battery with respect to Ballard. If her testimony was believed, she was in Walker's custody (she was in his cruiser and he told her that he was going to take her to jail), and he accepted sex as a bribe not to arrest her. Although Walker decries the lack of stronger corroborating evidence, as this court has pointed out before, "the test of sufficiency is concerned not with what evidence the state failed to produce, but with that which it did." *State v. Paramore* (Sept. 19, 1997), Hamilton App. No. C–960799, unreported, 1997 WL 602913. And, as we also pointed out in *Paramore*, "There is no rule of law that an alleged victim's testimony, as compared to that of any other witness, is inherently suspect and in need of further corroboration in order for the jury to find it credible."

Reviewing the evidence of record, furthermore, we cannot find any basis, even sitting as a "thirteenth juror," to disagree with the jury's resolution of the conflicts in the testimony of Ballard and Walker. Ballard's testimony was generally corroborated by the MDT records. She did not appear to have a motive to lie, nor did her testimony appear vindictive or inherently untruthful. Concededly, the jury was faced with a difficult decision of whom to believe, but we cannot say that this is the "exceptional case in which the evidence weighs heavily against the conviction."

■ Under the same analysis, we affirm Walker's conviction on the charges involving Hollin, with one exception: Walker's conviction for sexual battery arising out of the incident that allegedly occurred at her apartment on Gilbert Avenue. As noted, the jury acquitted Walker of the charge of bribery stemming from this incident. On review of the record, it is clear that sufficient evidence was not presented to show that Hollin was "in custody of law" for purposes of establishing a sexual battery under R.C. 2907.03(A)(6). Hollin testified that Walker merely came up to her apartment after spotting her in front of the building, and that she engaged in an act of prostitution, performing oral sex for eight or nine dollars. She testified that she did so because she needed the money to buy drugs. She never testified that she was placed or taken into custody, or even detained against her will. Asked if Walker had *ever* threatened her with warrants, she said, "Yes," but she never testified that he did so on that occasion,

or that he used warrants to threaten, or coerce, her into having sex. We have not found any case law expounding on the meaning of "custody of law" in R.C. 2907.03(A)(6). While the term is obviously elastic and does not necessarily require actual imprisonment or physical detention, we are convinced that it does require some showing that the victim's liberty was restrained by some power conferred by the state. We find no evidence of such restraint of liberty in Hollin's testimony with respect to this charge and thus vacate Walker's conviction for sexual battery in this instance based upon the sufficiency of the evidence.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his second assignment of error, Walker argues that his trial attorney, who succeeded in obtaining acquittals on seven of the counts and avoiding any sexual-predator adjudications, rendered ineffective assistance. We disagree.

In order to establish ineffective assistance of counsel, a defendant must first show that his counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Clemons* (1998), 82 Ohio St.3d 438, 449, 696 N.E.2d 1009, 1019. Second, the defendant must demonstrate that the errors prejudiced his case to the extent that he was denied a fair trial. *Id.* The defendant must demonstrate that, were it not for such errors, there exists a reasonable probability that the result of the trial would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

Initially, Walker argues that his trial counsel was ineffective because he did not oppose the consolidation of the indictment charging him with crimes involving Regina Ballard and Tracie Hollin with the indictment charging him with crimes involving Barbara Fant and Tasha Alexander. This, however, is not completely accurate. Prior to the trial in this case, this court issued its decision *State v. Knight* (1998), 131 Ohio App.3d 349, 722 N.E.2d 568, a similar case in which a police officer was accused of stopping women for minor or nonexistent offenses in order to extort sexual favors. A three-judge panel held that, in separate trials, the state could introduce evidence of "other acts" involving the police officer's alleged abuse of his position in exchange for actual or expected sexual favors, reasoning that such conduct constituted a "behavioral fingerprint" for purposes of Evid.R. 404(B).

The state filed its motion for consolidation based on this court's decision in *Knight*, arguing that the interest of judicial economy would be served, since the victims in one indictment would be "other acts" witnesses in the other. In response to this argument, Walker's counsel stated, "Judge, there is not much that I can say. I am familiar with the *Knight* decision and I know what it holds,

and even though I disagree with it, I am well aware of it, so there is nothing I can do about it."

We interpret trial counsel's statement as an objection combined with a forthright acknowledgement that the *Knight* decision appeared to stultify his position. While it is true that Walker's trial counsel did not renew an objection at the end of the trial, as is generally held necessary to preserve the issue for review on appeal, his failure to do so may have been a legitimate strategic decision. Indeed, the cases holding that the objection to joinder must be renewed at the close of trial recognize that the defense may have strategically changed its position during the course of the proceeding based upon a perception that developments had redounded to its advantage. See *State v. Owens* (1975), 51 Ohio App.2d 132, 5 O.O.3d 290, 366 N.E.2d 1367; *United States v. Porter* (C.A.8, 1971), 441 F.2d 1204; *Nassif v. United States* (C.A.8, 1967), 370 F.2d 147; and *Williamson v. United States* (C.A.9, 1962), 310 F.2d 192.

Walker next argues that his trial counsel was ineffective because he failed to object to "other acts" evidence presented through the testimony of Chyrae Dunham and Sacretta Simpson. Dunham testified that, during a drug arrest, Walker sequestered her in a hallway and kept touching her breasts under the netting of her shirt. She testified that when Walker discovered a crack pipe on her person, Walker implied that she could avoid having to go to jail by having sex with him. Simpson testified that after she received notice that she was in violation of her probation and had a warrant for her arrest, Walker, whom she had known before, came to her apartment and fondled her breasts. She stated that the next time he appeared, they had sex. Asked why she had sex with him, Simpson replied, "I was nervous. He was a police officer * * *." On cross-examination, Simpson stated that, although Walker often reminded her that she had warrants out for her arrest, he had never threatened to arrest her.

Walker's trial counsel did not object to either witness's testimony, perhaps out of a belief that the decision in *Knight* made such an objection futile. According to *Knight*, such acts constitute a "behavioral fingerprint," in other words a type of modus operandi, and their probative value is not outweighed by their potential for prejudice. It is noteworthy that Walker's trial attorney did successfully object to, and have stricken, the testimony of a third "other acts" witness who said only that Walker had merely touched her waist and hugged her—such conduct was clearly not probative of anything. (To paraphrase *Knight*, it was a smudged "behavioral fingerprint.")

While it may have been the better practice for the trial attorney to mark an objection to the testimony notwithstanding our decision in *Knight*, thus preserving the issue in case this court might wish to revisit *Knight* or distinguish it, or

for appeal to the Ohio Supreme Court, we cannot say that trial counsel's failure to do so constituted ineffective assistance of counsel. We note, furthermore, that Simpson's testimony may have, in fact, been helpful to the defense, as she testified that Walker had never threatened her with arrest in order to procure sex. Nor, it should be pointed out, can we say that the failure to object to such testimony had a prejudicial impact on the jury, which clearly considered each charge on its merits, acquitting Walker on seven of the eleven counts against him.

Walker also argues that his trial counsel was ineffective by failing to object to certain statements and leading questions by the prosecutor. Having examined the record, we find nothing improper in the statements, nor do we believe that trial counsel's isolated failures to object to certain leading questions fell below the standards of a competent attorney. We certainly cannot say that if Walker's trial counsel had objected to such questions, the jury probably would not have convicted him of any of the charges.

## V.

In his third assignment of error, Walker argues that it was error for the trial court to admit certain hearsay testimony involving Dreama Loweecy over objection of defense counsel. Upon review of the record, however, we agree with the state that the hearsay was proper rebuttal testimony to a line of questioning defense counsel had pursued in cross-examination. Defense counsel was attempting to show that certain names of women in Walker's daily activity notebook were there innocently, meaning that they were unrelated to any of the charges brought against him. As one example, defense counsel chose the name Dreama Loweecy. Unfortunately, as demonstrated by the prosecution on redirect, Loweecy had been interviewed by Sgt. Oliver and had made a claim that Walker had fondled her breasts. Given the context in which this testimony arose, we hold that the trial court did not err or abuse its discretion by considering it proper rebuttal evidence for which the defense may have inadvertently opened the door. See R.C. 2315.01; Evid.R. 404(B); *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382.

## VI.

In his final assignment of error, Walker argues that the trial court "abused its discretion" in sentencing him to a three-year period of incarceration on the four third-degree-felony charges on which he was convicted. According to Walker, he should have been placed on "probation" (*i.e.,* community control) because he is not likely to commit another crime and because he poses no danger to the public. Walker also argues that there were other mitigating factors in favor of community control: the lack of previous convictions, the absence (in his

view) of any physical or mental harm to the victims, and the fact that he is no longer a police officer.

In order to appeal his sentence pursuant to R.C. 2953.08(A), Walker, who was not given a maximum term, must show that the sentence is contrary to law, not an abuse of discretion. Walker has made no allegation that the necessary sentencing findings were not made, or that the necessary findings were not supported by the evidence. Rather, Walker argues simply that he should have been given a different sentence.

The trial court found that Walker's offenses were "more serious" than usual because of his law-enforcement occupation, because he used this occupation to facilitate his crimes, and because his public office or position of trust played a part in their perpetration. The court found no "less serious" factors. The court did make all the findings showing that recidivism was unlikely. But the court also found that a minimum sentence would demean the seriousness of the offenses and would not adequately protect the public. Finally, the court found that consecutive terms were justified due to the great or unusual harm caused, and to fulfill the purposes of sentencing.

We find no error in the court's findings. We agree that the crimes of which Walker was convicted are particularly egregious, striking at the public trust in its police force, and that anything less than a prison sentence would demean their seriousness.

In sum, we affirm the judgment of the trial court except in one particular: Walker's conviction for sexual battery arising out of the incident involving Hollin at her apartment on Gilbert Avenue (count four of the indictment) is reversed and Walker is discharged from further prosecution on that one charge.

*Judgment accordingly.*

DOAN, P.J., and SUNDERMANN, J., concur.