[Cite as *State v. Perpignand*, 2021-Ohio-4277.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                      :

      Plaintiff-Appellee,                      :                    No. 20AP-81
                                                                        (C.P.C. No. 18CR-1568)
v.                                                        :

                                                            (REGULAR CALENDAR)
Ralph Perpignand,                              :

      Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on December 7, 2021

---

**On brief**: *G. Gary Tyack*, Prosecuting Attorney, and *Taylor M. Mick*, for appellee. **Argued**: *Taylor M. Mick*.

**On brief**: *Yavitch & Palmer*, *Co., L.P.A.*, and *Jeffery A. Linn II*, for appellant. **Argued**: *Jeffery A. Linn II*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Defendant-appellant, Ralph Perpignand, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of sexual battery.

{¶ 2} On March 30, 2018, appellant was indicted on one count of sexual battery, in violation of R.C. 2907.03(A)(6). The matter came for trial before a jury beginning November 19, 2019.

{¶ 3} The first witness for the state was J.W., a resident of Knox County. In June 2015, J.W. was charged with burglary in Knox County. In March 2016, a Knox County Court of Common Pleas judge ordered her to be evaluated for competency and she was transferred from the county jail to Twin Valley Behavioral Healthcare ("Twin Valley"). J.W. was diagnosed with "bipolar, anxiety and OCD." (Tr. Vol. II at 200.) The Knox County trial

court determined J.W. to be a mentally ill person subject to hospitalization.  J.W. remained at Twin Valley for eight months and was released in June 2017.

{¶ 4}   At trial, J.W. related an incident that occurred while she was a resident at Twin Valley.  J.W. identified appellant as a staff member at Twin Valley.  On the date of the events at issue, appellant came into her room with a blood pressure machine in the morning, shortly after 7:30 a.m.  After taking the blood pressure of J.W.'s roommate, appellant sent the roommate "out of the room."  (Tr. Vol. II at 170.)  Appellant then came over to J.W.'s "side of the bed with the blood pressure machine."  J.W. thought it was "weird" that appellant was taking her blood pressure because she normally did not have her blood pressure checked.  (Tr. Vol. II at 171.)

{¶ 5}   J.W. testified that appellant then "started to touch my breast and put his mouth on my breast."  (Tr. Vol. II at 172.)  Appellant then said to her: "lift your shirt, why don't you lift your shirt."  (Tr. Vol. II at 173.)  J.W. testified she "couldn't really react because I was just kind of in shock."  (Tr. Vol. II at 173.)  Appellant "had me lift my shirt up and then he put his mouth on my breast."  (Tr. Vol. II at 173.)  J.W. testified that appellant then "began to touch me in my vaginal area."  (Tr. Vol. II at 175.)  She stated that "he ran his fingers down it and then it was like he put two fingers inside."  (Tr. Vol. II at 175.)  Appellant was wearing gloves at the time.  He "just kept saying, '[g]o with it, just go with it.' "  (Tr. Vol. II at 175.)  J.W. was telling appellant to stop.  Appellant "finally stopped," and then "went by the door" and said "[l]et me see your butt."  (Tr. Vol. II at 179.)  Appellant eventually left the room, and J.W. "sat at the edge of the bed * * * dumbfounded."  (Tr. Vol. II at 180.)

{¶ 6}   J.W. eventually made her way to the lobby and spoke to a "young lady" who was "in charge of drum circle."  (Tr. Vol. II at 184.)  J.W. testified that she spoke to this individual approximately 30 minutes after the incident occurred.  The lady took J.W. to a room, and J.W. "told her what happened."  (Tr. Vol. II at 187.)  J.W. was administered a rape kit at a hospital within 48 hours of the incident.

{¶ 7}   On cross-examination, J.W. testified that the burglary allegations against her in Knox County were a lie and that the alleged burglary victim lied in stating J.W. threatened to shoot everyone in the house.  J.W. acknowledged accusing the alleged burglary victim's boyfriend of exposing his genitals to her several weeks earlier.

{¶ 8}   With respect to the events of April 22, 2017, J.W. testified the incident occurred shortly after 7:30 a.m.  When asked if she reported the incident at 2:15 p.m., J.W.

responded: "I don't recall what time exactly I talked to the young lady at drum circle." (Tr. Vol. II at 216.) J.W. denied that staff offered to take her to a hospital for an examination.

{¶ 9} J.W. denied telling the staff that the incident began with the digital penetration and ended with touching of her breasts. J.W. responded: "I don't recall at what point I said how, what, when. I just remember telling them what happened." (Tr. Vol. II at 222-23.)

{¶ 10} Two days after the incident, J.W. was at Grant Medical Center ("Grant") for a sexual assault nurse examination ("SANE") after she spoke with an individual from Disability Rights of Ohio. Mary Marcum, a registered nurse, is currently employed as the SANE coordinator at Grant. Marcum conducted a sexual assault examination of J.W. and prepared records of the exam.

{¶ 11} J.W. reported to Marcum that a "therapeutic program worker" at Twin Valley "entered my room where myself and my roommate [A.S.] were sleeping and stood over [A.S.] until she woke up." (Tr. Vol. II at 274.) The staff member, who J.W. identified as "Ralph," indicated "he had to do vitals and came over to me and stood over me until I woke up and he said good morning." (Tr. Vol. II at 274.) After taking the vitals of A.S., "he looked over at me and said that I have vitals too." (Tr. Vol. II at 274.) J.W. related that A.S. went into the bathroom and, after A.S. came out of the bathroom, "he said medication time, go get your medication, which to me seemed funny because medication doesn't start until 8:00, but I just thought he was trying to get a jump start on things. Then [A.S.] said okay and started to leave the room." (Tr. Vol. II at 274.)

{¶ 12} J.W. then related to Marcum that "he came over and sat on the edge of the bed facing the door. Then he asked to see down there." (Tr. Vol. II at 275.) Marcum "clarified what down there was," and the patient clarified "down there is her vagina." (Tr. Vol. II at 275.) J.W. further reported to Marcum: "Then he kept grabbing it. * * * Patient clarifies grab her vagina. He kept trying to pull the elastic band down. Then he just pulled it down so you could see my vaginal area. And I could - - and I could see he was wearing gloves." (Tr. Vol. II at 275.)

{¶ 13} J.W. further reported:

> This is when he lifted up my pubic hair up that I had - - pubic hair up that I have and moved - - moved his head so he could actually see. He was touching and he inserted his finger. The whole time he was - - the whole time I'm telling him no, stop. I

kept telling him to stop, that someone was going to come in the room.  He kept pushing me down on my chest and kept saying it's going to be okay and I said, no, it's not okay. He kept pushing his finger in and out like a penis and I sat up and he said take your shirt off and I just kept telling him no, no.

I told him to stop because someone could come in and he kept saying pull your shirt up. I said no.  So then he takes his hands and lifts my shirt up and put his mouth on my right breast. Then I pull my shirt -- then I pull my shirt down and he gets up and he is at -- he is at the door and says, shh, don't tell, just me and you.  And then he said let me see your butt and I said no and he just stuck his hand down my pants and grabbed my butt and then he started to leave and said again don't say anything and left.

(Tr. Vol. II at 275-76.)

{¶ 14} Marcum conducted a physical exam of J.W. and did not find any injuries. J.W. declined an internal exam.  Swab samples were taken during the exam.

{¶ 15} One day after the examination, J.W. spoke with Ohio State Highway Patrol Trooper Sean Eitel, who is assigned to the patrol's investigative unit.  Trooper Eitel testified that Twin Valley is under the umbrella of the Ohio Department of Health and regulated by the State of Ohio.  Trooper Eitel investigated an alleged assault occurring April 22, 2017 at Twin Valley, in which appellant was identified as the alleged suspect.  Trooper Eitel, who noted appellant was employed at Twin Valley as a therapeutic worker, testified that therapeutic workers "have multiple things they do.  They'll maybe just comfort a patient with their needs, whether it be just somebody to talk to or – - and they get into even maybe taking a blood pressure at times or helping them with medication or something like that." (Tr. Vol. II at 299.)  J.W. was discharged from Twin Valley on June 1, 2017.

{¶ 16} Peter Tassi is employed with the Ohio Bureau of Criminal Investigation ("BCI").  Tassi, a forensic scientist in the DNA section, examined items collected during the investigation.  He identified an exhibit containing "skin stain swabs from the left nipple" and a "swab box labeled right nipple." (Tr. Vol. III at 339-40.)  Tassi also noted that a rape kit had been submitted as part of the investigation.  The skin swab findings identified "amylase," which "is a component of saliva." (Tr. Vol. III at 341.)  On cross-examination, Tassi stated he forwarded the samples to another individual for further testing.

{¶ 17} Katherine Dailey, a forensic scientist in the DNA section of BCI, testified that DNA can be transferred by bodily fluids "such as saliva, urine, semen, feces, blood" or "by means of touch." (Tr. Vol. III at 357-58.) Dailey performed an analysis of DNA profiles from appellant and prepared a report. The items analyzed were "a DNA standard from [J.W.] and skin swabs from the left and right nipples from the sexual assault kit." (Tr. Vol. III at 362.)

{¶ 18} Dailey testified that the skin swabs "from the left nipple, the DNA profile obtained from those was a mixture, meaning that there's more than one individual contributing to the DNA on that item." (Tr. Vol. III at 364.) Dailey further testified: "Part of that mixture is consistent with [J.W.] and she is included as an expected contributor because those samples were collected from her person. And there is also an unknown male that is sufficient for comparison." (Tr. Vol. III at 364.)

{¶ 19} At trial, Dailey identified one of the exhibits submitted by plaintiff-appellee, State of Ohio, as a DNA standard taken from appellant. Dailey testified that, with respect to the skin swabs from the left nipple, J.W. "is included as the expected contributor and additional unknown male profile was consistent with [appellant] and he is included as the major profile or the stronger profile in that mixture, so it was in a higher quantity in that mixture." (Tr. Vol. III at 366-67.) According to Dailey, the "number of individuals that I would have to test in order to find someone else that would be consistent with that major profile is a number that is rarer than one in one trillion unrelated individuals." (Tr. Vol. III at 367.)

{¶ 20} Regarding the skin swabs from the right nipple, Dailey stated the "DNA profile is also a mixture, meaning that there's more than one person contributing to that DNA profile" and that "[J.W.] is consistent with the additional data that's present there as well as the unknown male that is sufficient for comparison." (Tr. Vol. III at 364.) Dailey further testified: "The major DNA profile on that sample was consistent with [appellant] and the number of individuals that I would have to test in order to find someone that was consistent with the major DNA profile on that sample is also rarer than one in one trillion unrelated individuals." (Tr. Vol. III at 367.)

{¶ 21} At the close of the state's case, appellant made a Crim.R. 29 motion for judgment of acquittal on two grounds: (1) that J.W. was not credible, and (2) the prosecution did not provide sufficient evidence that appellant had supervisory or

disciplinary authority over J.W. The trial court overruled the motion regarding J.W.'s credibility and reserved ruling on the second basis at that time.

{¶ 22} The jury returned a verdict finding appellant guilty of sexual battery. At the sentencing hearing, the trial court denied appellant's Crim.R. 29 motion, stating in part: "[T]he court does find that when viewing the evidence in the light most favorable to the State of Ohio that the State did present sufficient evidence that appellant held a position of supervisory or disciplinary authority over the victim." (Tr. Sentencing Proceedings, Jan. 9, 2020 at 3.) By judgment entry filed on January 13, 2020, the trial court sentenced appellant to 48 months incarceration.

{¶ 23} On appeal, appellant raises the following two assignments of error for this court's review:

> [I.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE CHARGE BEYOND A REASONABLE DOUBT.
>
> [II.] THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 24} Under his first assignment of error, appellant contends the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal. Specifically, appellant argues there was insufficient evidence to prove he had supervisory or disciplinary authority over J.W. in order to sustain a conviction under R.C. 2907.03(A)(6). Appellant asserts there was no testimony from any person with actual knowledge about appellant's employment duties and responsibilities to establish the supervisory or disciplinary authority element of the offense. He further maintains the standard is an objective test, not a subjective one.

{¶ 25} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 12, citing *State v. Knipp*, 4th

Dist. No. 06CA641, 2006-Ohio-4704, ¶ 11.  Accordingly, we review the trial court's denial of appellant's motion for acquittal using the same standard applicable to a sufficiency of the evidence review.  *Id.* at ¶ 12, citing *State v. Darrington*, 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15.

{¶ 26}  In reviewing a sufficiency of the evidence claim " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  Sufficiency is, in essence, "a test of adequacy," and "[w]hether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 27}  In determining the sufficiency of the evidence, an appellate court must give " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' "  *State v. Gordon*, 10th Dist. No. 10AP-1174, 2011-Ohio-4208, ¶ 5, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Thus, when reviewing the sufficiency of the evidence, the court does not weigh the credibility of the witnesses.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.  Consequently, a verdict will not be disturbed based on insufficient evidence unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that "reasonable minds could not reach the conclusion reached by the trier of fact."  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 28}  Appellant was indicted on one count of sexual battery in violation of R.C. 2907.03, which provides in part:

> (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
>
> * * *
>
> (6) The other person is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person.

{¶ 29}  R.C. 2907.03(A)(6) is a strict liability offense.  *State v. Arega*, 10th Dist. No. 12AP-263, 2012-Ohio-5774, ¶ 14, citing *State v. Fortson*, 8th Dist. No. 92337, 2010-Ohio-2337, ¶ 13.  In this respect, the statute "makes criminal even voluntary sexual conduct

between consenting adults" if the victim is in the custody of law or institutionalized in a hospital, and if the offender had supervisory or disciplinary authority over the other when the sexual conduct occurred. *Id.*

{¶ 30} Ohio appellate courts have noted: " 'The purpose of the statute is to protect from sexual abuse those who come under the care and custody of the State. The statute is directed at those situations where the offender, through power conferred by the State, is able to coerce or force sexual activity by the misuse of that authority.' " *State v. Walker*, 140 Ohio App.3d 445, 453-54 (1st Dist.2000), quoting *State v. Chipps*, 3d Dist. No. 14-82-1 (May 17, 1983).

{¶ 31} While the terms supervisory or disciplinary authority are not statutorily defined terms, this court has previously defined them pursuant to the rules of grammar and common usage. *See State v. Mathess*, 10th Dist. No. 77AP-45 (Nov. 1, 1977). Specifically, the court in *Mathess* defined the terms as follows:

> The definition of "authority" as contained in *Webster's Third New International Dictionary Unabridged* is "power to require and receive submission: the right to expect obedience: superiority derived from a status that carries with it the right to command and give final decisions: dominion, jurisdiction * * *: delegated power over others: authorization * * *: power to influence the outward behavior of others: practical personal influence * * *: persons in command * * *."
>
> "Supervise" is defined, "to coordinate, direct, and inspect continuously and at first hand the accomplishment of: oversee with the powers of direction and decision the implementation of one's own or another's intentions: superintend."
>
> "Discipline" is defined as, "training or experience that corrects, molds, strengthens, or perfects * * *: punishment: as * * * punishment by one in authority, esp. with a view to correction or training * * *: control gained by enforcing obedience or order * * *."

{¶ 32} In both *Mathess* and *Arega,* this court considered challenges by defendants to convictions under R.C. 2907.03(A)(6). Under the facts in *Mathess*, the defendant worked as a power plant laborer at a state hospital, and some of the patients were inmates who also worked at the institution. The defendant was convicted of three counts of sexual battery for engaging in sexual conduct with three different patients, and he challenged on

appeal the sufficiency of the evidence to allow the jury to find he had supervisory or disciplinary power over the patients. In reviewing the record, this court noted the testimony established the defendant "would tell the patient what to do in a specific case," and if the patient did not comply the patient's supervisor would be notified. *Mathess.* Further, the defendant's supervisor testified it was necessary "to keep very direct control over the patients," and that the defendant "had to exercise supervisory control over the patients that worked there." *Id.* In this respect, the supervisor had observed the defendant "chase patients out of the power house." *Id.* Thus, the facts of that case indicated the defendant was in a position of command and could direct the patients' behavior, and this court affirmed the defendant's conviction for sexual battery, finding "ample evidence" the defendant had "both supervisory and disciplinary authority over the patients." *Id.*

{¶ 33} In *Arega*, this court reviewed several decisions (including *Mathess*) addressing R.C. 2907.03(A)(6), and determined the evidence was insufficient to establish the defendant had supervisory authority over the victim. Under the facts of *Arega*, the defendant was employed at a skilled nursing facility as a state tested nursing assistant ("STNA"), and the victim was a patient needing rehabilitation after suffering a broken leg. The function of a STNA at that facility was to "basically communicate with the patients' needs; wash them up, do range of motion and things of that nature." *Arega* at ¶ 24. Other testimony described the STNAs' role as "basically to provide or assist, enable, to be as independent as possible in doing their personal care; getting trays, eating, feeding." *Arega* at ¶ 25. The testimony also established the patients had the power to make their own decisions regarding medical and therapy care.

{¶ 34} In reversing the defendant's conviction for sexual battery under R.C. 2907.03(A)(6), the court in *Arega* determined the evidence did not indicate the defendant had any authority to command or direct the victim, or to make any decisions on her behalf or to engage in any undertaking that required an exercise of the defendant's judgment because he performed perfunctory-type tasks. *Id.* at ¶ 27. This court also addressed and distinguished the *Mathess* decision, noting the "patients' stay at the hospital" in *Mathess* was "custodial in nature," and that the defendant "was in a position of command where he could direct their behavior." *Id.* at ¶ 19.

{¶ 35} Turning to the sufficiency of the evidence in the instant case, the record indicates J.W. testified the staff at Twin Valley "did the job they needed to do when things

got tough, things got out of hand."  (Tr. Vol. II at 163.)  She stated the staff had disciplinary power and authority over the patients, and that she had to do what the staff told her to do. J.W. identified appellant as a therapeutic nurse at Twin Valley; she testified he "had a presence about him of authority," and "[p]eople took [appellant] very seriously."  (Tr. Vol. II at 166.)  When a fight occurred, "he was one of the staff members that would make sure that proper disciplinary procedures or – - I don't even want to say disciplinary procedures. When a fight would break out * * * they made sure that the person was taken down."  (Tr. Vol. II at 166.)  J.W. described appellant as "a strong person," and "he was one of the staff members that would be used to make sure that - - that things ran the way they were supposed to be run and, if need be, that he was strong enough to take on a situation if things got out of hand with two patients fighting or things like that."  (Tr. Vol. II at 166-67.)  She testified appellant had authority over the patients.  Other tasks she saw appellant complete included calling patients to breakfast, taking their blood pressure, listening to patients, playing cards with patients, and making them feel comfortable.

{¶ 36}  While discussing the specifics of the incident, J.W. stated: "He knew I didn't have a choice.  He knew, you know."  (Tr. Vol. II at 175.)  J.W. testified she did not scream for help during the incident because "I knew in my heart if I screamed - - I mean, you're in - - I'm in a mental ward.  I'm watching people getting strapped to freaking beds and their heart having to be monitored with machines.  I didn't know how much power he had."  (Tr. Vol. II at 178.)  She stated that "you do what you're told there.  You just - - you just do, okay." (Tr. Vol. II at 179.)

{¶ 37}  Trooper Eitel also testified on behalf of the state regarding appellant's duties. Trooper Eitel explained that appellant worked as a therapeutic worker, and the trooper provided examples of a therapeutic worker's responsibilities, including comforting and listening to patients, helping them with medications or even taking blood pressure readings.

{¶ 38}  Construing the evidence most strongly in favor of the prosecution, as we are required in considering a sufficiency challenge, we conclude, as did the trial court in ruling on the Crim.R. 29 motion, the state presented evidence sufficient to support an inference appellant had supervisory or disciplinary authority over J.W.   Here, the record indicates J.W. was a patient at Twin Valley on the authority of the Knox County Court of Common Pleas; that court ordered her to be evaluated for competency and she was transferred from

county jail to Twin Valley. In contrast to the facts in *Arega,* in which the patients were not in a locked facility and made their own medical decisions, appellant's presence at Twin Valley was more akin to the facts in *Mathess,* i.e., custodial in nature.

{¶ 39} Further, while appellant contends the testimony of J.W. regarding her subjective beliefs is insufficient to establish the elements of the offense, the testimony included more than the victim's subjective reaction to appellant's conduct. Specifically, J.W. also provided testimony as to appellant's status at Twin Valley based on her (objective) observations of his position/role at the facility, in which she described his duties and interactions with the patients, including his conduct in breaking up fights and restoring order (i.e., evidence as to " 'control gained by enforcing obedience or order' "). *Mathess*, quoting *Webster's Third New International Dictionary Unabridged.* J.W. also specifically stated appellant had authority over the patients, and the state's evidence, taken in its entirety, was adequate to indicate appellant exercised control over the patients and that J.W. was required to comply with his commands. Moreover, nothing in the case law suggests the victim's testimony cannot supply proof of the elements (i.e., supervisory or disciplinary authority) of the offense. *See*, *e.g.*, *Walker* at 445 (finding sufficient evidence, "based on the victim's own testimony," to support defendant's conviction for sexual battery under R.C. 2907.03(A)(6)).

{¶ 40} When viewed in a light most favorable to the prosecution, a rational trier of fact could have found the elements of disciplinary or supervisory authority proven beyond a reasonable doubt. Accordingly, the trial court did not err in denying appellant's Crim.R. 29 motion for judgment of acquittal.

{¶ 41} Based on the foregoing, appellant's first assignment of error is overruled.

{¶ 42} Under his second assignment of error, appellant contends his conviction is against the manifest weight of the evidence. In seeking reversal on manifest weight grounds, appellant primarily challenges the credibility of J.W.

{¶ 43} In contrast to a sufficiency of the evidence argument, a manifest weight of the evidence challenge "questions whether the state met its burden of persuasion." *State v. Adhikari*, 8th Dist. No. 103935, 2017-Ohio-460, ¶ 47, citing *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. In addressing such a challenge "[a] reviewing court 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.,* quoting *Thompkins* at 388.  Under Ohio law, "[a] conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 44}  In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  We therefore "afford great deference to the jury's determination of witness credibility."  *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14.

{¶ 45}  Appellant argues that J.W. is not credible since she was previously deemed incompetent and mentally ill and told different versions of the event with varying details, such as the order of events in which appellant violated her (i.e., whether she was standing, sitting, etc.).  Appellant contends J.W. denied several of her mental health issues and diagnoses and testified that the victim in her burglary case was lying.

{¶ 46}  This court has previously recognized, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996).  *See also State v. Meadows*, 10th Dist. No. 80AP-593 (June 23, 1981) ("minor inconsistencies could be grounds for reversal only if they were of such a magnitude that, in light of them, no reasonable person would believe the witness' testimony").  Further, "the fact finder is free to believe all, part or none of the testimony of each witness appearing before it," and "[m]ere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment."  *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 17.  Finally, "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the defendant's version."  *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 39, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.

{¶ 47} The jury in this case heard evidence that J.W. was diagnosed with mental illness.  Despite minor inconsistencies in her testimony, such as timing, J.W.'s version of the events was consistent regarding the major points, such as appellant putting his mouth on her breasts and inserting his gloved fingers into her vagina.  Further, the jury heard expert DNA testimony corroborating J.W.'s testimony that appellant put his mouth on her breasts.  As noted, the state presented the testimony of a forensic scientist who stated, based on analysis of the DNA profiles obtained from J.W.'s breast, the major DNA profile on the samples "was consistent with [appellant]," and that the number of individuals "I would have to test in order to find someone that was consistent with the major DNA profile" on those samples was "rarer than on one in one trillion unrelated individuals."  (Tr. Vol. III at 367.)  With respect to evidence regarding appellant's position and duties at the facility, the jury, as trier of fact, could have properly credited J.W.'s testimony on this issue as going to the element of supervisory or disciplinary authority.

{¶ 48} Based on this court's review, we conclude the jury could have reasonably found all the elements of the offense, and that it did not lose its way or create a manifest miscarriage of justice in finding appellant guilty of sexual battery under R.C. 2907.03(A)(6).  Accordingly, appellant's conviction is not against the manifest weight of the evidence.

{¶ 49} Appellant's second assignment of error is not well-taken and is overruled.

{¶ 50} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

_____